**Juan C. Chavez**, OSB #136428
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-328-3982

    Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| THE ESTATE OF GRAYSON JAMES-ALLEN PAINTER and JENNIFER PAINTER, *Personal Representative,*<br><br>    Plaintiffs,<br><br>    v.<br><br>STATE OF OREGON; TIMOTHY DYER; JOSHUA AHN; RAYMOND GARGALICANA; EMILY ASAY; KATHLEEN UNDERWOOD; and JOHN DOES 1-20,<br><br>    Defendants. | Case No. 6:24-cv-02042<br><br>COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983); and State Tort Actions (Wrongful Death and Negligence; and Abuse of a Vulnerable Person)<br><br>JURY TRIAL DEMANDED |

    This is a civil rights action against the above-named actors concerning their deliberately indifferent treatment of Mr. Grayson James-Allen Painter, a person in their custody and care, resulting in his preventable suicide. Plaintiff's Estate, personally represented by his mother, Jennifer Painter, now seeks money damages for the death of her son. Defendant State of Oregon has a history and pattern of unconstitutional treatment of mentally ill people in their custody and

care and provides constitutionally deficient mental health care. Their agents' actions and inactions also constitute negligence and abuse of a vulnerable person.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4); and supplemental jurisdiction over all state and common law claims under 28 U.S.C. § 1367.

## VENUE

2. Venue is proper within the District of Oregon because the events giving rise to this claim occurred in this judicial district, and all but one of the defendants reside in this judicial district. *See* 28 U.S.C. § 1391(b). The acts and practices alleged herein predominantly occurred in the City of Salem, Marion County, Oregon.

## PARTIES

3. Plaintiff Jennifer Painter is a citizen of the State of New Jersey and is the personal representative of the Estate of Grayson James-Allen Painter. She was Mr. Painter's mother.

4. Plaintiff The Estate of Grayson James-Allen Painter is an estate administered in the State of Oregon. *In the Matter of: Grayson James-Allen Painter*, Marion County Court Case No. 24PB05760 (2024).

5. Defendant State of Oregon is a sovereign state in the United States of America with the capacity to sue and be sued under the Oregon Tort Claims Act. The Oregon Department of Corrections (ODOC) is a subdivision of the State of Oregon. Decedent Grayson James-Allen Painter was a prisoner in ODOC's custody from approximately May 24, 2023, until his death on June 29, 2023. At the time of the events described herein, Mr. Painter was incarcerated at Oregon State Correctional Institution (OSCI) in Marion County, Oregon.

6.     Defendant Timothy Dyer is a correctional sergeant at OSCI. At all relevant times he was acting under color of law and is sued in his individual capacity.

7.     Defendant Joshua Ahn is a correctional sergeant at OSCI. At all relevant times he was acting under color of law and is sued in his individual capacity.

8.     Defendant Raymond Gargalicana was a correctional sergeant at OSCI. At all relevant times he was acting under color of law and is sued in his individual capacity.

9.     Defendant Emily Asay is the correctional counseling manager at OSCI. At all relevant times she was acting under color of law and is sued in her individual capacity.

10.    Defendant Kathleen Underwood is a Behavioral Health Services evaluator at OSCI. At all relevant times she was acting under color of law and is sued in her individual capacity.

11.    Plaintiff does not know the true names and capacities of Defendants sued herein as John Does 1-20, and therefore sues these Defendants by fictitious names. John Does 1-10 are sued in their individual capacities and are Oregon Department of Corrections personnel who were personally involved with the allegations made below, conspired with, aided and abetted, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged. John Does 11-20 are sued in their individual capacities and are State of Oregon personnel who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged.

## FACTUAL ALLEGATIONS

12.    Grayson Painter was a 22-year-old man living in and around Washington County and Multnomah County in the State of Oregon. Mr. Painter was living with mental illness, including cognitive issues stemming from a traumatic brain injury he sustained in a 2019 motor vehicle

accident, a psychotic disorder, ADHD, substance use disorder, and documented history of suicidal ideation and self-harm.

13.     Mr. Painter was booked into Washington County Jail on or around May 4, 2023, for a probation violation. From the time he entered Washington County custody until his transfer to Oregon Department of Corrections custody on May 24, 2023, Mr. Painter was on suicide watch on three separate occasions for multiple days at a time, which is well-documented in his jail medical record. In fact, the day before Mr. Painter was transferred to ODOC, his classification level was one step below suicide watch and jail staff noted that he had been experiencing suicidal ideation and symptoms of mental illness.

14.     Between September 2022 and May 2023, Mr. Painter spent over 6 months in Washington County custody cumulatively. His medical file from Washington County is replete with documentation of behavioral health concerns. During this time, Mr. Painter spent approximately 59 days on suicide watch. His medical file clearly indicates that Mr. Painter suffered from acute mental illness and one jail mental health provider even wrote in two different American Society of Addiction Medicine ("ASAM") evaluations that "AIC is at [risk] for deteriorating mental functioning without 24-hour care."

15.     Grayson Painter entered ODOC custody on May 24, 2023. His mental health intake notes from Coffee Creek Intake Center (CCIC) and prior medical records indicate that Mr. Painter had numerous hospital encounters in the past for suicidal ideation and psychosis, including visual and auditory hallucinations, and that Mr. Painter stated that being held in segregated holding cells increased his hallucinations and delusions.

16.     On May 31, 2023, Mr. Painter was evaluated by Lisa Rivera, PMHNP, from Behavioral Health Services (BHS) at CCIC. Mr. Painter described his delusions to the evaluator and detailed

two recent suicide attempts that he made while he was in segregation in Washington County custody. The evaluator stated that he would benefit from a higher level of care and monitoring at another institution.

17. On June 5, 2023, Ryan McKone, QMHP, wrote on a mental health referral form for Mr. Painter that he "also reports some acts of self-harm while in segregation."

18. Mr. Painter was transferred to Oregon State Correctional Institution (OSCI) on June 28, 2023, and immediately placed in mental health housing. A BHS evaluator, Defendant Kathleen Underwood, performed a mental health screening on Mr. Painter at 8:50 AM on June 29, 2023. Mr. Painter denied thoughts of suicide, but Defendant Underwood noted that Mr. Painter was irritable, confused, and a bit manic, and that he reported that he was going to stop taking his medication.

19. The Oregon Department of Corrections had knowledge of Mr. Painter's history of severe mental illness, and specifically the fact that isolation increased Mr. Painter's suicidal ideation, when they decided to send him to OSCI's Disciplinary Segregation Unit (DSU) in the afternoon of June 29, 2023.

20. The DSU—*i.e.*, solitary confinement, a practice internationally known as a form of torture that the Oregon Department of Corrections continues despite knowledge of its dangers—is not safe for a person with Mr. Painter's vulnerabilities. These cells are typically 6 x 9 feet across. Staff only allow minimal time outside of the cell.

21. Grayson Painter was brought into the DSU at OSCI to provide a urine sample. Staff believed that Mr. Painter's erratic behavior was the result of intoxicants.

22. Grayson Painter's medical records from ODOC, Washington County, and outside providers indicate a lack of consensus regarding the source of Mr. Painter's psychosis. Some

diagnose him with substance-induced psychosis, and others with various psychotic disorders unrelated to drug use.

23. At 2:30 PM on June 29, 2023, while processing Mr. Painter's transfer to the DSU, Defendants Dyer and Ahn observed Mr. Painter banging his head against the metal side of the holding cell. Instead of providing Mr. Painter with safety or care to prevent self-harm, Defendant Ahn threatened to pepper spray Mr. Painter if he did not stop banging his head on the cell. Defendants Ahn and Dyer then placed Mr. Painter in a holding cell with a camera so he could be observed while in the DSU.

24. An adult-in-custody (AIC) who was in DSU at the same time as Mr. Painter reports that OSCI correctional officers (Defendants John Does 1 to 10) were encouraging Mr. Painter to commit suicide. They did so by yelling at Mr. Painter, "Why don't you just kill yourself, motherfucker?" and other similar statements. Neighboring AICs also report that the officers called Mr. Painter names while taunting him.

25. Mr. Painter was weeping, asking correctional staff to have a book to read. An AIC tried to console him from their cell, offering Mr. Painter books. Mr. Painter ultimately declined, stating that he "won't be around much longer."

26. AICs also report that DSU officers (Defendants John Does 1 to 10) performing "tier checks" walk around the unit, but often do not look into cells or check in with AICs who are on suicide watch.

27. At 2:50 PM on June 29, 2023, Defendant Underwood saw Mr. Painter for a second time. Ms. Underwood wrote "unable to assess level of functioning due to erratic behaviors," noting that Mr. Painter was experiencing delusions, was suspicious of his surroundings, and was yelling.

28. At 3:30 PM, Defendant Gargalicana arrived at the DSU and noted that Mr. Painter was throwing water around his cell and onto the tier. Defendant Gargalicana remarked that Mr. Painter's in-cell camera was no longer functioning.

29. At 4:38 PM, Officer-of-the-Day ("OD," a designated staff member who stands in the place of the functional unit manager) Defendant Asay arrived at the DSU, and Defendant Gargalicana told her that the camera to Mr. Painter's cell was not working. Despite Mr. Painter's recorded medical history, observed self-harm behaviors earlier that day, and the sergeants' request to place him in a cell that allowed for 24-hour surveillance, there is no indication that ODOC staff tried to engage with Mr. Painter, provide him with any care, check on Mr. Painter, or fix the camera in his cell after it stopped working.

30. At 6:55 PM, Officer Clark performed a security check/tier check in the DSU. When he went to Mr. Painter's cell, he observed Mr. Painter hanging by his neck from the cell bars with a bed sheet. Officer Clark requested support from other DSU staff to cut him down. Mr. Painter's body was then placed on the floor, and various officers and prison medical personnel performed CPR until emergency medical personnel arrived. Despite being unconscious and unresponsive, Mr. Painter's ankles were shackled as soon as he was placed on the floor of the tier. At 7:30 PM on June 29, 2023, emergency medical personnel pronounced Mr. Painter dead.

31. The urine sample Mr. Painter gave when he entered DSU custody that day was sent to a laboratory for testing. The urinalysis results came back negative.

32. Even the remote possibility of Mr. Painter using illegal substances was evidence enough for ODOC staff to deliberately choose to deny him life-saving mental health treatment and dismiss Mr. Painter's mental suffering and anguish. Whether Mr. Painter's psychosis was drug-induced or not, he was displaying symptoms of severe mental health crisis that required

immediate intervention from a trained behavioral health provider—intervention that ODOC is simply unequipped or unwilling to offer. Indeed, ODOC's solution for suicidality and behavioral disruption is often to isolate an individual in solitary confinement, a process which mirrors the punishment a person receives when they are accused of misconduct, such as using illicit drugs.

33. Mr. Painter was clearly experiencing a mental health crisis when he entered the DSU on June 29, 2023. The State of Oregon's negligence and deliberate indifference in failing to properly address and monitor Mr. Painter's disabilities caused his death.

34. Standards promulgated by the National Commission on Correctional Health Care ("NCCHC") for prisons state that "[w]hen suicides do occur, appropriate corrective action is identified and implemented to prevent further suicides." OSCI currently faces litigation regarding its poor treatment of people in custody with mental illness and suicidal ideation.

35. NCCHC also states that "high-risk periods include immediately upon admission, following new legal problems (e.g., new charges, additional sentences, institutional proceedings, denial of parole), after the receipt of bad news regarding self or family (e.g., serious illness, the loss of a loved one), after suffering humiliation (e.g., sexual assault) or rejection, or pending release after a long period of incarceration. In addition, inmates in the early stages of recovery from severe depression may be at risk, as are inmates newly admitted to segregation or in single-cell housing." Mr. Painter exhibited signs and symptoms of suicidal ideation at many of the same crucial high-risk periods as detailed above and including on the date of his successful suicide attempt.

36. NCCHC also recommends that "[a] treatment plan should be developed or revised for any inmate expressing suicidal ideation. This treatment plan should be developed by the mental health staff in conjunction with the patient to address relapse prevention and initiate a risk

management plan. The risk management plan should describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur; how recurrence of suicidal thoughts can be avoided; and actions the patient or staff can take if suicidal thoughts do occur." As detailed above, Mr. Painter's records indicate that treatment plans were created, but that they did not appear to take Mr. Painter's continued endorsement of prior suicidal ideation seriously enough to formulate a safety plan for him.

37.     Mr. Painter is survived by his mother, Plaintiff Jennifer Painter, who is also serving as the personal representative of his estate. She loves and misses her son dearly.

38.     In his final days in ODOC, Mr. Painter was clearly suffering greatly mentally and emotionally. His death from hanging likely caused him great physical pain.

39.     His death also affected the health and safety of the AICs around Mr. Painter. After witnessing the harm suffered by Mr. Painter, AICs feel even more unsafe in ODOC's custody.

**Claim 1**
**(42 U.S.C. § 1983: Deliberate Indifference to a Serious Medical Need and Substantial Risk)**

40.     Plaintiff re-alleges and incorporates Paragraphs 1 through 39.

41.     All individual Defendants are persons under within the meaning of 42 U.S.C. § 1983.

42.     The individual Defendants were deliberately indifferent to Mr. Painter's serious medical need in not adequately treating, screening, housing, and protecting a person with Mr. Painter's conditions in their custody—particularly, Defendants failed to ensure that a patient with severe persistent mental illness was not placed into solitary confinement; failed to get an assessment for head trauma when it was observed and known; failed to move to a higher level of care when Mr. Painter's behavior and health appeared to worsen; failed to initiate suicide watch precautions after demonstrated self-harm; failed to address the camera failure in Mr. Painter's cell; failed to regularly monitor Mr. Painter while he was in a double-door cell; punished instead of treated a

patient undergoing a severe mental health crisis; and encouraged his suicide with their words and actions. In taking these actions, Defendants were deliberately indifferent to Mr. Painter's serious medical needs and were deliberately indifferent to a serious risk of harm to him, in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

43.    The individual Defendants acted with malice or with reckless disregard when they encouraged Mr. Painter to commit suicide. Plaintiff seeks punitive damages against these Defendants in an amount sufficient to punish a defendant and to deter similar acts in the future.

44.    Because of the individually-named Defendants' violations of Mr. Painter's rights, Plaintiff suffered death. Defendants' actions and inactions are the direct and proximate cause of Mr. Painter's death, bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, expenses, worry, fear, anguish, shock, anxiety, and nervousness. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 2
### (State Tort: Wrongful Death)

45.    Plaintiffs reallege paragraphs 1 through 44.

46.    As alleged above, because Defendant State of Oregon provided inadequate treatment, screening, housing, and protection to persons with mental illness and suicidal ideation, it was foreseeable that these unreasonable practices would end in Mr. Painter's death.

47.    Failing to train and discipline its correctional officers and medical personnel in the appropriate treatment of people with Mr. Painter's conditions is unreasonable given the grave risk of severe harm to the public, and to Mr. Painter.

48.    In particular, Defendants negligently failed to ensure that a patient with severe persistent mental illness was not placed into solitary confinement; failed to get an assessment for head

trauma when it was observed and known; failed to move to a higher level of care when Mr. Painter's behavior and health appeared to worsen; failed to initiate suicide watch precautions after demonstrated self-harm; failed to address the camera failure in Mr. Painter's cell; failed to regularly monitor Mr. Painter while he was in a double-door cell; punished instead of treated a patient undergoing a severe mental health crisis; and encouraged his suicide with their words and actions.

49.     It was reasonably foreseeable that Defendants' agents' actions as detailed above would create a substantial risk of injury or death to Mr. Painter.

50.     Defendant State of Oregon's agents were negligent in providing inadequate medical care to mentally ill and suicidal people in their custody, and in failing to cure past deficiencies in these practices through training and/or discipline.

51.     Defendant State of Oregon is liable for the conduct of their agents. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

## Claim 3
### (State Tort — Abuse of a Vulnerable Person)

52.     Plaintiffs reallege paragraphs 1 through 51.

53.     ORS 124.100(2) provides that, "a vulnerable person who suffers injury, damage or death by reason of physical abuse… may bring an action against any person who has caused the physical… abuse or who has permitted another person to engage in physical… abuse."

54.     A "vulnerable person" is someone with "a disability who is susceptible to force, threat, duress, coercion, persuasion or physical or emotional injury because of the person's physical or mental impairment." ORS 124.100(1)(e)(D).

55. Mr. Painter suffered from several conditions that would qualify him as a vulnerable person: a traumatic brain injury, a psychotic disorder, ADHD, substance use disorder, and documented history of suicidal ideation and self-harm.

56. As alleged above, Defendants and Defendant State of Oregon's agents subjected Mr. Painter to abhorrent, abusive treatment that resulted in physical injury and death.

57. Defendants and Defendant State of Oregon's abuse caused Mr. Painter's death. Accordingly, Mr. Painter is entitled to treble economic and non-economic damages in an amount to be proven at trial, and reasonable attorney's fees. ORS 124.100(2)(a)-(c).

## REASONABLE ATTORNEY'S FEES AND COSTS

58. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

59. ORS 124.100(2)(a)-(c) allows reasonable attorney's fees in actions brought under ORS 124.100.

60. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

## DEMAND FOR JURY TRIAL

61. For all claims alleged in this Complaint, Plaintiff demands a jury trial.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. For economic and non-economic damages in an amount to be determined at trial on all claims;

B. For reasonable attorneys' fees and costs on Claim 1 pursuant to 42 U.S.C. § 1988;

C.  For treble damages and attorney's fees on Claim 3 pursuant to ORS 124.100(2)(a)-(c); and

D.  Such other relief as the court deems just and proper.

DATE: December 9, 2024

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Oregon Justice Resource Center
Attorney for Plaintiffs

*LEAD ATTORNEY*

COMPLAINT
Page 13 of 13